IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AL-AMIN ABDULLAH AKBAR,

                    Plaintiff,                                      ORDER

        v.
                                                          Case No. 17-cv-442-slc
TODD OVERBO,

                    Defendant.

---

*Pro se* plaintiff Al-Amin Abdullah Akbar is proceeding in this lawsuit on a First
Amendment claim against defendant Todd Overbo, related to Overbo's decision to refuse Akbar's
July 2012 request for a plant-based halal diet. Overbo has filed a motion for summary judgment
(dkt. 52). Akbar has responded fully to Overbo's motion; he also has filed a motion for assistance
in recruiting counsel (dkt. 62). Having reviewed the evidence of record in the light most
favorable to Akbar, I conclude that a reasonable trier of fact could not find that Overbo's decision
violated Akbar's First Amendment rights. In any event, Overbo is entitled to qualified immunity.
Finally, I conclude that Akbar's filings establish that he was fully capable of opposing–and did
adequately oppose–Overbo's motion. Accordingly, I am granting Overbo's motion for summary
judgment, denying Akbar's request for assistance in recruiting counsel, and closing this case.

UNDISPUTED FACTS[1]

At all times relevant to his claims, Al-Amin Abdullah Akbar was incarcerated by the
Wisconsin Department of Corrections (DOC) at the Wisconsin Secure Program Facility (WSPF),
where Todd Overbo was working as a Chaplain. Akbar is Muslim and has practiced Islam
throughout his incarceration by the DOC. Akbar's religious practices have included participating

---

[1] I have drawn these facts from the parties' proposed findings of fact and responses, along with the
cited evidence of record.

in Ramadan, reading Islamic library books, attending Jumma services, and eating Muslim religious meals.

## I.     DOC Religious Practices Policies

DOC prisoners are given opportunities to pursue the lawful religious practices of their religion of choice. DOC's Division of Adult Institutions (DAI) administers religious accommodations through Umbrella Religion Groups (URG). DOC's goal is to address the spiritual needs of prisoners in a manner that factors in rehabilitation objectives, structured programming, and the health, safety, and security concerns of the correctional environment. The URG structure was developed in consultation with community faith group leaders years ago. DOC's policies organize accommodations by grouping prisoners with similar beliefs and practices into URGs that represent and incorporate the range of religious denominations and sub-groups. The eight URGs are Catholic, Eastern Religions, Humanist/Atheist/Agnostic, Islam, Judaism, Native American/American Indian, Pagan, and Protestant/Other Christian.

Each prisoner may choose and designate his URG, either by an intake interview or by filing a DOC 1090, "Religious Preference" form. This designation determines which religious services or study groups that prisoner may attend, which religious property he may obtain, and which dietary accommodations he may be eligible to receive. Prisoners may seek to supplement these accommodations by engaging in individualized practices or study related to any faith regardless of their URG designation.

DOC offers three standard religious diets: halal, kosher, and plant-based (previously labeled "vegan"). Relevant to Akbar's claim are the plant-based and halal diets. The halal diet has been available since 2008 to prisoners who have declared an Islamic URG preference. The halal diet is identical to the plant-based diet, except that the halal diet adds meat four times a

week, plus halal-compliant fish when it is served on the general menu. The balance of the halal diet is vegan foods, with one exception: the halal diet included milk until 2015, when milk was replaced with a non-dairy fortified fruit drink.

Prisoners who have not declared a religious preference may request DOC's plant-based diet. Prisoners of any faith or no faith also have the option of choosing to receive the general fare menu and then self-selecting from it to avoid certain foods for any reason, religious or secular.

DAI Policy and Procedure 309.61.03 governs how facilities administer religious diets. Prisoners may request a religious diet if their personal sincerely held religious beliefs require abstention from foods contained in the general fare menu. To request such a diet, prisoners must submit form DOC-2167 to the institution Chaplain. Prisoners must sign the form, which acknowledges and accepts the Religious Diet Participation Agreement (RDPA). The RDPA states that prisoners are expected to comply with their professed religious dietary tenets at all times, which includes food items purchased from canteen. It further provides that prisoners who violate the RDPA by consuming prohibited foods twice within six months may be removed from their religious diet, after which they must wait six months before reapplying for a religious diet.

When an institution chaplain receives a prisoner's DOC-2167, the chaplain is responsible for reviewing the form and approving or denying the request. Part of this review may include interviewing the prisoner to assess the basis for his request, during which the chaplain might ask the prisoner for examples of prohibited foods or special handling procedures. The chaplain also may ask the prisoner to cite the religious tenets that support his requested dietary practices. If the chaplain denies the request, then the prisoner may appeal by submitting a DOC-2075, "Request for New Religious Practice" form. The DOC-2075 form is reviewed by the chaplain and the institution supervisor, who make their recommendations and forward the DOC-2075 to DOC's Central Office. At that point, the DOC's Religious Practices Advisory Committee

(RPAC) conducts a thorough review, including any necessary research, then makes a recommendation. Based on the cumulative record of the prisoner's request and the recommendations by the chaplain, supervisor and RPAC, the institution's warden makes the final decision on the prisoner's appeal.

According to Kelli West, the DAI's Religious Practices Coordinator, DOC has a legitimate interest in limiting prisoners' ability to go on-and-off religious diets at will; hence the requirement that prisoners wait six months to renew a request for a religious diet that has been stopped. Specifically, West avers that consistency in religious diets furthers orderly and efficient food services for DOC's population of 23,000 prisoners across 36 facilities. Beyond pointing out the large population the DOC servers, West explains that DOC's Food Service operations are ill-suited for restaurant-type food preparation and accommodations. While restaurants can cater to individual requests because they use a variety of small-scale pieces of equipment for food preparation, DOC's Food Service operations are more complex than restaurant cooking, in large part due to the DOC's unique security concerns, which require: criminal background checks for all food vendor delivery staff; large-sale, high efficiency, tamper-proof equipment; secure food storage areas; and food deliveries at 1-4 week intervals that require inspections for contraband and stowaways.

Thus, says West, if DOC changed its approach to allow at-will changes to diets, then DOC would need additional food service staff, different equipment, and more deliveries, which, in turn would require more security staff and procedures. An additional complication is that DOC Food Service operations are staffed by workers and prisoners who often are untrained, may not read well, and require both continual supervision and frequent retraining. Allowing for frequent meal adjustments would add another layer of training and supervision, which, in addition to being less efficient, can lead to mistakes that could result in a food-borne illness

outbreak. West further opines that allowing for restaurant or a la carte service would require more time and resources, which simply is not feasible in an institutional setting that operates on a strict timetable.

West also claims that the DOC furthers its interest in orderly prison administration by ensuring that prisoners are granted access to religious diets only if they demonstrate a sincerely held religious belief supporting their need for the diet. West explains that this policy buttresses consistency within the prison system because prisoners are less likely to withdraw from a genuine religious diet. West reports, however, that in the past decade DOC has experienced an increase in religious diet requests, some of which are made for non-religious reasons. This has inappropriately burdened DOC by increasing costs and inefficiencies. For example, West avers that prisoners have told chaplains that they want a religious diet for health reasons, weight loss, fear of food tampering, or to drive up costs to protest kitchen procedures. West explains that this trend of insincere religious diet requests has burdened the DOC's food service by inappropriately increasing costs and increasing the fluctuation in religious diet numbers.

### III. Akbar's Religious Diet History

At his deposition, Akbar testified that from 2002 to the present, he has mainly "eaten Muslim religious meals provided by the DOC." (Akbar Dep. (dkt. 50) 26.) He acknowledges the sometime between 2002 and 2005, he removed himself from that religious diet by choice, which he testified was in accordance with both DOC policy and his religious beliefs:

> The reason is that, one, it's my choice formally or religiously, and it's my formal choice because it's within the rules. There's a religious choice to get on the diet or take myself off the diet, and then finally it was – as a matter of fact, I'll leave it there. It was my choice, formally and religiously it was my choice to do it.

> (*Id*. at 30.)

On June 5, 2005, Akbar submitted a DOC-2167 request for "Plant Based-Animal Free Meals." Chaplain Overbo approved the request on June 29, 2005, and Akbar started receiving the plant-based diet. About eight months later, on February 7, 2006, Akbar asked to be removed from that diet. That request was granted. Akbar has testified that removing himself from the plant-based diet at that point still complied with his religious beliefs.

About two years later, on April 3, 2008, Akbar submitted another DOC-2167 form, requesting to be placed on the "Plant-Based diet and or Non Animal or Animal Product" diet. Overbo approved that request on May 9, 2008. On August 20, 2009, Akbar was removed from that diet because on two occasions Akbar had purchased non-vegan food items (cheese popcorn, chocolate chip cookies, Doritos, and Chicken Cup-O-Noodles) from the canteen.

Akbar acknowledges that he could have reapplied for a religious diet six months later (namely, on February 20, 2010) but he did not reapply until January 14, 2011, 17 months later. Akbar explained at his deposition that he did not "always want to make it look like, you know, you're begging somebody or you're kissing somebody's butt or whatever. So you just try to do for yourself." (Akbar Dep. (dkt. 50) 52.)

On January 14, 2011, when Akbar did submit a new request, he asked for a "Plant-Based diet/non Animal and or Non-Animal content (Vegan) diet." Overbo met with Akbar to discuss this request. Akbar asked whether the plant-based diet had changed, and Overbo responded that it had not. Akbar decided to request the halal diet instead. Overbo approved this request on February 2, 2011, and Akbar was placed on the halal diet.

On January 9, 2012, Akbar was removed from the halal diet at his own request because he believed that the sodium powder in the food was causing an increase in his blood pressure. Akbar does not recall speaking to anyone in the Health Services Unit about his blood pressure, and he does not know whether sodium powder was used in other diets at the institution at the

time. Akbar cannot recall whether he attempted to request a low sodium religious diet accommodation.

### III.    Overbo Denies Akbar's Religious Diet Request

On July 19, 2012, Akbar submitted a request to receive "Vegan meals/ Non-Animal or Non-Animal content." Akbar does not remember having obtained a doctor's approval to go back on a religious diet at that time. When Overbo received the request, he scheduled an interview with Akbar to discuss the basis of the request, apparently because of Akbar's history of removing himself from religious diets and from being removed from a religious diet for purchasing prohibited items.

On August 20, 2012, prior to the scheduled interview, Overbo was near Akbar's cell and the two briefly discussed the upcoming interview. According to Akbar, Overbo commented that he had an issue with Akbar's request because Akbar had been "off and on vegan meals," and that Overbo remembered why Akbar removed himself from the plant-based diet in January of 2012.

The interview took place on August 22, 2012. According to Overbo, Akbar stated that he had gone off the vegan diet in the past because of health-related concerns, specifically, that he wanted a low-sodium diet, and Overbo responded that Akbar should take up that type of concern with the HSU. However, Akbar claims that he did not mention health issues during this meeting, and he only told Overbo that he wanted to be on the plant-based diet to adhere to his religious beliefs. Likewise, Akbar claims that Overbo never referred him to the HSU.

Whatever actually was said during the interview, Overbo denied Akbar's request, instead directing him to self-select from the general fare menu to eat in accordance with his religious beliefs. Overbo did not provide any reasons for the denial on Akbar's DOC -2167 form, but Overbo avers that he denied the request because Akbar had a history of removing himself from

the halal diet, Akbar had committed canteen violations when he had been on the plant-based diet in the past, and Akbar had not demonstrated a sincerely held belief when he removed himself from a religious diet for medical reasons without consulting with the HSU.[2]

Akbar appealed the decision, and Overbo recommended denying the appeal, commenting: "This inmate has a history of religious diets as he admits himself in his appeal." (Ex. 1008 (dkt. 55-5) 4.) Overbo then listed the dates Akbar had been on and off the diets, noting that on February 7, 2006, Akbar "wanted off" the vegan diet; on August 20, 2009, Akbar had "canteen violations"; and on January 19, 2012, Akbar came off the halal diet because "he hates sodium??" (*Id.*) Overbo thus concluded: "Due to his frequent diet requests and getting off – I recommend denying him the diet." (*Id.*) Overbo's supervisor, Vicki Sebastian concurred. The RPAC recommended denying Akbar the diet as well, adding that Akbar should discuss any health issues he may have with his physician, but that "Mr. Akbar has not demonstrated a sincerely held belief in vegetarianism sufficiently to successfully adhere to expectations of the DAI religious diets program." (*Id.* at 12.) WSPF's warden issued a final decision on October 29, 2012, denying the request. Akbar filed an inmate complaint about this denial, which was denied on December 27, 2012.

On February 20, 2013, Akbar requested a religious diet again. Overbo no longer was the chaplain at WSPF. Akbar's request was denied because six months had not passed since the warden denied his previous request. Akbar renewed the request in April of 2013, and it was granted: he was provided a religious diet again.

When asked at his deposition how Overbo's 2012 denial of his diet was different from instances in which Akbar took himself off a religious diet, Akbar responded:

---

[2] Overbo did not doubt the sincerity of Akbar's commitment to Islam. Overbo merely determined that Akbar views maintaining a halal diet as a choice.

I don't think it was different because if you recall, I did tell you I was self-selecting and I felt out of place. But I could not sue myself or I could not – I mean I could not – I mean I got back on those diets as you got my history with you is my answer.

(Akbar Dep. (dkt. 50) at 67.)

Akbar testified that when he was not on a religious diet – that is, when he was able to self-select from th general diet in a manner that comported with his religious beliefs – he considered it "burdensome," because it caused him headaches, stomach discomfort, and frustration. (*Id.* at 51-52, 65, 74.) Akbar adds that his frustration was significant enough for him to seek out help from psychological services. (*See* Ex. D (dkt. 70-4.) According to West, Akbar should have been able to self-select, since he mainly only needed to avoid pork and pork derivatives. Akbar responds that there are a lot of other foods besides pork that are not halal, but he has not provided any examples of foods he had to throw away when self-selecting from the general diet.

## OPINION

Overbo seeks summary judgment in his favor both on the merits and on qualified immunity grounds. Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F. R. Civ. P. 56(a). If the moving party meets this burden in his submissions to the court, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). At the summary judgment stage, disputed facts are viewed in the light most favorable to the non-moving party; however, this treatment does not extend to inferences supported only by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925

F.3d 336, 345 (7th Cir. 2019). "As the put up or shut up moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citations omitted).

## I.      Akbar's First Amendment Claim

The First Amendment protects Akbar's right to free exercise of his religion, but that right is limited in the prison context. To survive summary judgment, Akbar must "submit evidence from which a jury could reasonably find that the defendant[] personally and unjustifiably placed a substantial burden on his religious practices." *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (quoting *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016)). "A substantial burden "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id.* (quoting *Thomas v. Review Br.*, 450 U.S. 707, 718-18, 101 S. Ct. 1425 (1981)). Even then, a burden is justified when it is "reasonably related to a legitimate penological interest," the standard set forth by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89-91 (1987). *Thompson*, 809 F.3d at 379.

### A.  Overbo's Decision Did Not Substantially Burden Akbar

Overbo argues that Akbar cannot prove that Overbo's August 2012 denial of Akbar's request for the vegan halal diet substantially burdened Akbar's religious practice because Akbar engaged in periods of self-selection and twice– in 2006 and 2012– chose to remove *himself* from the plant-based diet. Akbar acknowledges that he had self-selected from the general diet in the

past, but he characterizes these periods of self-selection as "burdensome," because he had to throw a lot of food away, which caused him headaches, stomach pain, and mental anguish.

On these facts, even when Akbar gets the benefit of all reasonable inferences, his claim of substantial burden doesn't have a lot of traction. Let's start by comparing the number of months Akbar was on the plant-based or halal diet to the number of months that he chose to be off of those diets. For an unknown period of time that could have started as early as 2002 and that ended on June 5, 2005, Akbar simply chose not to be on a plant-based or halal diet. That's up to 3½ years of self-selection with no evidence that Akbar ever reported to HSU with stomachaches or headaches, or asked for dietary advice. Any burden on Akbar during this period would have been self-imposed.

Thereafter, the relevant time period is from June 5, 2005 (when Akbar asked to start the plant-based diet) to July 19, 2012 (when Akbar made his fourth request to return to that diet). Within this 85-month span, I will consider Akbar to be "on" his requested diet from the date he requested it, and I will not count the six months that WSPF removed Akbar from his chosen diet for snacking on chocolate chip cookies and Doritos. During this time, Akbar chose to be on his religious diet for roughly 36 months and chose to be off it for roughly 47 months, and his longest period of time when he on a plant-based or halal diet was 16 months, at which point he was removed for purchasing non-vegan items from the canteen. When Akbar chose to remove himself from the halal diet in January 2012, he did so based on his subjective belief–for which he has provided no supporting evidence–that there was sodium powder in that food that was spiking his blood pressure, a concern that he never ran past anyone in HSU or food services.

At best, then, Akbar chose to eat a plant-based or halal diet about three-quarters as often as he chose to self-select. Accepting Akbar's assertions as true, this means that he chose to endure self-inflicted mental anguish and physical distress for the majority of the relevant time period. During this time, he never once reported or complained to anyone.

It is Akbar's burden in this lawsuit to prove by a preponderance of the evidence that Overbo's refusal to return Akbar to the plant-based diet put substantial pressure on him as a Muslim to modify his behavior and to violate his beliefs. In response to Overbo's motion for summary judgment, Akbar does not attempt to distinguish between his past periods of self-selected diet and the 2012-2013 time period to show that Overbo's 2012 denial actually required him to alter his behavior. For example, Akbar has not presented evidence or argument demonstrating how Overbo's 2012 decision to deny Akbar's request to return to the plant-based diet affected Akbar more adversely than Akbar's decisions to take himself off of the diet.

To the contrary, Akbar acknowledged at his deposition that there were *no* differences between his voluntary periods of self-selection and the period of self-selection caused by Overbo (Akbar Dep. (dkt. 50) 67): his religious experience was the same for both and his psychological and physical symptoms were the same. The only difference was that Akbar didn't get to make the decision that he would stay on the general diet, Overbo did. Akbar's inability to control *when* he self-selected does not suggest that he was *unable* to self-select in June of 2012 as he had in the past. In other words, Overbo's refusal to allow Akbar to opt out of the general diet for the fourth time did not require Akbar to modify his behavior in a way that violated his beliefs because Akbar voluntarily had spent four of the previous seven years engaging in this exact same behavior with no apparent concerns over headaches, stomachaches, stress, or adequate nutrition.

Next, although I am skeptical, I must accept–and therefore do accept–Akbar's report that he actually did suffer headaches and stomach aches when he self-selected his food from the general diet. As just noted, Akbar was willing to endure these symptoms when he *chose* to be on the general diet, but for the purposes of this lawsuit, Akbar asserts that these same symptoms

*became* substantially burdensome during the period Overbo denied his request to switch back to the plant-based diet. Akbar has not supported this assertion with any evidence. He has not provided any examples of his eating habits while self-selecting from the general diet: he doesn't report which foods he was avoiding as haram, which foods he was eating as halal, nor has he submitted any evidence that his nutrition was inadequate during his period of involuntary self-selection in 2012 and 2013.

What was it about a self-selected general diet that gave Akbar headaches and stomachaches in 2012-13? Akbar doesn't say. Why didn't Akbar identify the problematic foods and stop eating them? Akbar doesn't say. Why didn't Akbar report his symptoms to HSU? Asked differently, what prevented Akbar from modifying his general diet so that it was halal and did not cause him headaches, stomachaches and stress? Akbar doesn't say. Apparently, Akbar didn't even try. As just noted, these issues never concerned Akbar during the on-and-off four years that he chose to be on the general diet; they only became a concern when Overbo denied his fourth request to leave the general diet. Without any evidentiary points to connect the dots, the record does not support a finding that Overbo's decision put substantial pressure on Akbar to modify his behavior and to violate his beliefs.


**B. Overbo's Denial Was Reasonably Related to Legitimate Penological Interests**

To the extent that Akbar's claims of headaches, stomachaches and mental distress could be viewed as rendering the substantial burden question a closer call than I have found it, I will analyze Overbo's decision against the test of *Turner v, Safely, supra.* Courts are to consider four factors when determining whether a prison restriction is reasonably related to a legitimate

penological interest: (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether there are alternative means of exercising the right; (3) what impact an accommodation of the asserted right will have on guards and other inmates; and (4) whether there are obvious alternatives to the restriction. *Watkins v. Kasper*, 599 F.3d 791, 796-97 (7th Cir. 2010) (quoting *Turner*, 482 U.S. at 89-91).

### 1. Rationally Related to a Legitimate Governmental Interest

While a prisoner plaintiff has the burden to disprove the validity of the regulation, prison officials still must articulate a legitimate governmental interest in the regulation and provide some evidence supporting their concern. *Riker v. Lemmon*, 798 F.3d 546, 553 (7th Cir. 2015) (quoting *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011)). In assessing such justifications, courts afford prison officials substantial deference. *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them")).

The court's inquiry is objective, so that a restriction may be valid even if the underlying subjective reason given at the time is not. *Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009) ("It is not clear why one bad motive would spoil a rule that is adequately supported by good reasons."). The first factor of the *Turner* analysis is significant, and can be dispositive. *See Singer*, 593 F.3d at 534 ("The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts.").

14

Here, Overbo's August 2012 denial of Akbar's request was grounded on the need to limit the provision of religious diets to prisoners with a sincerely-held need for them, which is rationally related to DOC's goal of providing orderly food service. Kelli West, the DAI's Religious Practices Coordinator, has thoroughly described the security and quality control challenges DOC faces in providing daily meals to its 23,000 prisoners throughout 36 institutions. West explains that allowing prisoners to modify their diet without a sincerely held religious belief increases costs, the risk of mistakes, the risk of spreading illnesses, and it injects inefficiencies into food services, which, in turn, impairs daily operations in the institutions more generally.

DOC's interest in orderly, efficient, cost-effective, and safe food service is undoubtedly legitimate. *Koger v. Bryan*, 523 F.3d 789, 800 (7th Cir. 2008) ("[O]rderly administration of a prison dietary system, and the accommodations made thereunder, are legitimate concerns of prison officials."). Likewise,

> A prison is entitled to ensure that a given claim reflects a sincere religious belief, rather than a preference for the way a given diet tastes, a belief that the preferred diet is less painful for animals, or a prisoner's desire to make a pest of himself and cause trouble for his captors.

> *Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011).

Akbar does not dispute the facts underlying Overbo's decision to deny his July 2012 DOC-2167. Instead, Akbar dissects *how* Overbo handled his request in an effort to prove that Overbo's denial was actually arbitrary. First, Akbar points to Overbo's alleged August 20 statement that the "issue" he had with Akbar's request was that he had been "off and on vegan meals," arguing that this statement indicates that Overbo's denial was not grounded in a legitimate justification. Akbar is incorrect. Overbo's statement, which I will assume he actually

15

made, was consistent with Overbo's later explanation for the denial: that he did not believe that Akbar needed to receive the vegan halal diet to practice his sincere religious beliefs.

Akbar complains that in the August 22, 2012, denial, Overbo did not actually write down a reason, and only elaborated when Akbar appealed the denial. Again, this does not suggest that Overbo's denial in August of 2012 was inconsistent with his later statements or his averments in his declaration. Even assuming, *arguendo,* that they *were* inconsistent, Overbo was not required to explain his reasoning to Akbar, and his subjective motive is irrelevant since the inquiry is objective. *Hammer*, 570 F.3d 798; *see also Akright v. Hepp*, 434 F. App'x 543, 544-45 (7th Cir. 2011) (challenge to the reliance on justifications put forth during course of litigation foreclosed by *Hammer*). On this record, however, Overbo's actual reasons for denying Akbar's DOC-2167 for a plant-based diet align with those provided in Akbar's appeal of his decision: Akbar's history of not following the plant-based diet and taking himself off of that diet, without any evidence of a medical reason, did not demonstrate a sincerely held religious belief.

Accordingly, I conclude that, on this record, Overbo's denial bore a rational relationship to the DOC's legitimate interests in orderly food service and administration, and providing religious meals to prisoners whose sincerely held religious beliefs require them.

### 2. Alternative Means

Akbar argues that self-selection was not feasible, pointing to the headaches and stomach pains he claims that he suffered when self-selecting. On this record, it would have been reasonable for Overbo to perceive self-selection as appropriate, since Akbar had done it in the past by his own choice for long stretches of time. No evidence suggests that Overbo had reason

16

to believe that Akbar's previous periods of self-selection had not provided Akbar with adequate nutrition. Actually, the contrary appears to be the case: Akbar told Overbo that he believed that the plant-based diet was negatively impacting his health. Said differently, even assuming that Akbar had suffered physically and emotionally during the periods of time in which he was self-selecting, he did not inform Overbo that self-selection had not been adequate in the past. As such, while Akbar testified about the challenges of maintaining a halal diet through self-selection, he has not submitted any evidence indicating that Overbo had reason to believe that self-selection was not an adequate method for Akbar to follow his religious diet. This factor, therefore, weighs against Akbar.

### 3. Adverse Impact of Accommodation

Akbar claims that allowing him to be on the religious diet would not have been burdensome because he had followed the policy by waiting well over six months before he asked to be put back on the plant-based diet in July of 2012. However, this argument cuts against Akbar because he is pointing to instances where he *followed* the policy in the past. In this lawsuit, Akbar needs to present evidence that an *exception* to the policy would not be disruptive.

Akbar points out that many other prisoners receive religious diets, which is indisputable, but entirely beside the point. The State is not claiming that DOC could not have prepared one more plant-based meal for Akbar, it is claiming that orderly and efficient food service on such a massive scale with so many untrained, uneducated workers requires levels of consistency and predictability that cannot be achieved when prisoners are allowed to jump into and out of special diets as they please. Akbar has not submitted any examples of prisoners who did this

with no consequences. Akbar has not submitted any examples of prisoners who DOC determined did not have a genuine religious need for a halal or plant-based diet but who received it anyway. Akbar has not shown that making an exception for him, alone, would not negatively affect DOC's interest in food service consistency and efficiency, or its interest in accommodating only sincerely-held religious beliefs.

### 4. Obvious Alternatives to the Denial

The only obvious alternative Akbar points to would be for Overbo to have made an exception for him. Overbo responds that this alternative opens the door to inconsistencies and manipulation. Akbar does not dispute West's representations about a recent rise in insincere religious diet requests. Therefore, I agree with the State that allowing an exception sets a problematic precedent. Therefore, this factor works against Akbar as well.

While I have given the most weight to the first *Turner* factor, the remaining factors weigh against Akbar as well. As such, I conclude that Overbo is entitled to judgment in his favor on the merits of Akbar's First Amendment claim.

## II.   Qualified Immunity

As a fallback argument, Overbo contends that he is entitled to qualified immunity. "Qualified immunity protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)). The inquiry is two-

fold: "(1) whether the facts, taken in the light most favorable to the plaintiff[], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

Whether a right was "clearly established" is grounded in the notion of fair notice. Thus "[a] rule is too general if the lawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *District of Columbia v. Wesby*, -- U.S. --, 138 S. Ct. 577, 199 L. Ed.2d 453 (2018) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034 (1987)). The Court of Appeals for the Seventh Circuit recently reminded courts that "clearly established law cannot be framed at a 'high level of generality.'" *Campbell*, 936 F.3d at 545 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074 (2011)). Rather, "[e]xisting caselaw must dictate the resolution of the parties' dispute," meaning that the "precedent must have placed the . . . constitutional question beyond debate.'" *Campbell*, 936 F.3d at 545 (citations omitted). Accordingly, courts must "[f]rame the constitutional right in terms granular enough to provide fair notice." *Id.*

Akbar's position is that since his right to a religious diet was clearly established in 2012, Overbo is not entitled to qualified immunity. Akbar is defining the clearly-established right too broadly. The right should be defined in a way that incorporates the *Turner* standard. Therefore, Overbo's suggestion seems more accurate: what Akbar is asserting is a First Amendment right to repeatedly stop and start a religious diet at will. Akbar has not directed the court to a decision by the Supreme Court or the Seventh Circuit that has articulated such a right and then found in favor of the prisoner under the *Turner* standard. Accordingly, I conclude that, even assuming

Overbo's denial violated Akbar's First Amendment rights, he is entitled to qualified immunity here.

III.    **Motion for Assistance in Recruiting Counsel**

Finally, I am denying Akbar's motion for assistance in recruiting counsel. Akbar claims that this case is factually complex, that it requires expert testimony, and that he has limited access to the law library. As a starting point, a pro se litigant does not have a right to counsel in a civil case, *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), but a district court has discretion to assist pro se litigants in finding a lawyer to represent them. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007).

A party who wants assistance from the court in recruiting counsel must start by showing that he is indigent and that he unsuccessfully shopped his case in the private market. *Santiago v. Walls*, 599 F.3d 749, 760–61 (7th Cir. 2010). Akbar has taken these steps.

However, Akbar has not shown that this is one of the relatively few cases in which it appears from the record that the legal and factual difficulty of the case exceeds the litigant's demonstrated ability to prosecute it. *Pruitt*, 503 F.3d at 654–55. "The question is not whether a lawyer would present the case more effectively than the pro se plaintiff" but instead whether the pro se litigant can "coherently present [his case] to the judge or jury himself." *Id.* at 655. Almost all of this court's pro se litigants would benefit from the assistance of counsel, but there simply are not enough lawyers willing to take these types of cases to give each plaintiff one. Accordingly, the court must decide for each case "whether this particular prisoner-plaintiff, among many deserving and not-so-deserving others, should be the beneficiary of the limited

resources of lawyers willing to respond to courts' requests." *McCaa v. Hamilton*, 893 F.3d 1027, 1036 (7th Cir. 2018) (Hamilton, J., concurring).

To start, Akbar did not need expert testimony to oppose Overbo's motion for summary judgment. This case turned on whether there were disputed issues related to Akbar's history of being on and off the halal diet, Akbar's ability to eat a nutritionally adequate halal diet through self-selection, and whether a reasonable jury could conclude that Overbo's denial was not related to a legitimate penological interest. Neither party needed to come forward with expert testimony on any of these points. Therefore, Akbar's inability to provide expert testimony does not indicate he needed counsel to respond adequately to Overbo's motion.

Next I find that Akbar had the capacity to respond adequately to Overbo's motion. Akbar's submissions were well above average for a pro se prisoner plaintiff. His filings confirm that he is aware of the relevant facts and legal standards, that he has been able to gather the available discovery relevant to his claim, and that the limitations of his confinement have not prevented him from preparing his opposition evidence and brief. Akbar filed a 52-page opposition brief that thoroughly laid out the history of his religious practices and argued every relevant point of his First Amendment claim. Akbar's affidavit and 32 exhibits establish that he was well-prepared and highly capable of opposing Overbo's motion. Akbar did a commendable job advocating for himself. There is no basis for me to conclude that the legal and factual difficulty of responding to Overbo's motion for summary judgment exceeded Akbar's abilities. Put another way, on these facts, recruiting an attorney to represent Akbar would not have changed the outcome. Therefore, I am denying his request for assistance in recruiting counsel.

ORDER

IT IS ORDERED that:

1) Defendant Todd Overbo's motion for summary judgment (dkt. 52) is GRANTED.

2) Plaintiff Al-Amin Akbar's motion for assistance in recruiting counsel (dkt. 62) is DENIED.

3) The clerk of court is directed to enter judgment in Overbo's favor and close this case.


Entered this 9th day of December, 2019.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge